Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Steven T. Henesy, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY, | Docket No.: _____(     ) |
| Plaintiffs | |
| - against - | |
| INSTA DRUGS INC. and NERIK ILYAYEV, | |
| Defendants. | |

-----------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants Insta Drugs Inc and Nerik Ilyayev (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a fraudulent scheme perpetrated by the Defendants who have exploited the New York "No-Fault" insurance system by submitting, or causing to be submitted, hundreds of fraudulent charges to GEICO for medically unnecessary "pain relieving" topical prescription drug products along with other excessive pharmaceutical products

(collectively, the "Fraudulent Pharmaceuticals") that Insta Drugs Inc ("Insta Drugs") purportedly dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

2.     The Defendants Insta Drugs and its owner, Nerik Ilyayev ("Ilyayev"), engaged in a "quick-hit" fraudulent scheme whereby the pharmacy opened and closed within a six-month period, submitting approximately $750,000.000 in billing to GEICO in a four-month span.  The Defendants' scheme involved submitting fraudulently inflated charges to GEICO by intentionally targeting a set of select topical pain products, including lidocaine 5% ointment and diclofenac 3% gel (collectively, the "Fraudulent Topical Pain Products"), which the Defendants dispensed in place of other effective, but much-less costly prescription and non-prescription drug products, along with other pharmaceutical products dispensed without regard for genuine patient care.

3.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with certain prescribing healthcare providers (the "Prescribing Providers"), and persons ("Clinic Controllers") who work at or are associated with multidisciplinary medical clinics that almost exclusively treated No-Fault patients ("No-Fault Clinics"), and steered them to prescribe and direct large volumes of prescriptions to Insta Drugs for the Fraudulent Pharmaceuticals in exchange for kickbacks or other financial incentive without regard for the medical necessity of the prescriptions.

4.     The scheme spearheaded by the Defendants to steer the Prescribing Providers and the Clinic Controllers to routinely prescribe and direct prescriptions to Insta Drugs for large volumes of the Fraudulent Pharmaceuticals pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Insta Drugs and Ilyayev billed as much as $2,286 for a single tube of lidocaine 5% ointment and $3,396.00 for a single tube of diclofenac

3% gel, while also billing for other unnecessary Fraudulent Pharmaceuticals. The Defendants did this knowing that there were a wide range of similar or more effective medications available at a fraction of the cost, including over-the-counter medications, which could have been dispensed to the Insureds.

5.      By this action, GEICO seeks to recover more than $203,400.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Insta Drugs of over $529,000.00 in pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted through Insta Drugs because:

(i)      Insta Drugs billed for Fraudulent Pharmaceuticals that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and caused Insta Drugs to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO; and

(iv)     the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Insta Drugs pursuant to illegal, invalid, and duplicitous prescriptions.

6.      The Defendants fall into the following categories:

(i)      Insta Drugs is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals to patients and then

submitted bills to GEICO and other New York automobile insurers for reimbursement to which it is not entitled; and

(ii)     Ilyayev is the purported owner of Insta Drugs.

7.      The Defendants' scheme began in 2019 and, although Insta Drugs has closed active pharmacy operations, the scheme has continued uninterrupted to the present day as Defendants continue to attempt collection on the fraudulent billing.

8.      As discussed more fully below, the Defendants at all times have known that: (i) Insta Drugs billed for Fraudulent Pharmaceuticals that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and had Insta Drugs dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO; and (iv) the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Insta Drugs pursuant to illegal, invalid, and duplicitous prescriptions.

9.      Based on the foregoing, Insta Drugs does not now have – and has never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.   The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims for the Fraudulent Pharmaceuticals that have been identified to-date which the

Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $203,400.00.

## THE PARTIES

### I.      Plaintiffs

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

11.      Defendant Ilyayev resides in and is a citizen of New York, living in Queens County.  Ilyayev is the purported owner of Insta Drugs.

12.      Defendant Insta Drugs is a New York corporation, incorporated on or about August 22, 2019, with its principal place of business at 584A East 187th Street, Bronx, New York.

13.      Insta Drugs became registered as a pharmacy with the New York State Education Department Office of the Professions on November 18, 2019.

14.      Insta Drugs closed active pharmacy operations and transferred its registration to another pharmacy, Lifestyle Pharmacy Inc, approximately one year after Insta Drugs was incorporated, on August 28, 2020.

## JURISDICTION AND VENUE

15.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

17.     GEICO underwrites automobile insurance in the State of New York.

18.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

19.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

20.     The No-Fault Laws limits reimbursement for benefits to prescription drugs only. over-the-counter drugs and products which may be purchased without prescription are not covered expenses under the No-Fault Laws.

21.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician

or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

22.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

23.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

24.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient.".

25.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

II.    **An Overview of Applicable Licensing Laws**

26.    Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

27.    Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

28.    Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

29.    Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based patient comorbidities, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

30.    Pursuant to 8 N.Y.C.R.R. § 63.1(7)(ii), when a prescription is delivered to the patient off the premises of a pharmacy through mail delivery, a delivery service or otherwise, the pharmacy shall, among other things, include with each prescription a written offer to counsel the patient or person authorized to act on behalf of the patient who presents the prescription.

31.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

32.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

33.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

34.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

### III.   The Defendants' Scheme Involving Fraudulent Pain Products

35.     Beginning in 2019, the Defendants, including Insta Drug and Ilyayev masterminded and implemented a fraudulent scheme in which they used Insta Drugs to bill the New York automobile insurance industry for hundreds of thousands of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

36.     As part of the fraudulent scheme, Insta Drugs purported to be a small, neighborhood pharmacy purportedly owned by Ilyayev.

37.     Insta Drugs first became registered to operate as a pharmacy in New York State on November 18, 2019.

38.     Once it began operating, Insta Drugs did not engage in any legitimate advertising to the public, maintained no website, and did virtually nothing that would be expected of a legitimate pharmacy to develop its reputation, attract customers, and draw legitimate business.

39.     Despite the absence of an efforts to legitimately build a pharmacy business or generate the referral of prescriptions from patients or prescribing professionals, Insta Drugs billed GEICO alone more than $833,000.00 for only sixteen pharmaceutical products in a span of approximately six months between November 27, 2019 and May 18, 2020.  Of those charges, approximately $750,000.00 in charges were submitted by Insta Drug to GEICO in a four-month period between December 2019 and March 2020.

40.     To conceal its fraudulent scheme, Insta Drugs purported to be a neighborhood pharmacy catering to the needs of the local population.  However, prescriptions for the Fraudulent Topical Pain Products containing lidocaine and/or diclofenac (i.e., lidocaine 5% ointment and diclofenac 3% gel) constituted more than 94% of the billing Insta Drugs submitted to GEICO.

41.     Not surprisingly, the U.S. Department of Health issued a report which noted that pharmacies with questionable billing primarily billed for topical drugs containing lidocaine and diclofenac, and that the "OIG has previously raised concern about potential fraud and abuse related to both diclofenac and lidocaine."  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

42.     The Defendants knew that there was no legitimate reason that Insta Drugs received voluminous prescriptions containing diclofenac and/or lidocaine over the course of only six months; knew that there was no legitimate medical need for the exorbitantly priced Fraudulent Topical Pain Products to be dispensed to the Insureds; and knew that there existed a wide range of

inexpensive, over-the-counter products of similar efficacy that could have been dispensed to Insureds.

43.     The Defendants obtained voluminous prescriptions over the course of only six months because the Defendants steered certain Prescribing Providers and Clinic Controllers associated with the No-Fault Clinics to prescribe large volumes of prescriptions to Insta Drugs for the targeted set of Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals, pursuant to predetermined protocols, and in exchange for kickbacks and other compensation.

44.     As part of the collusive relationships among the Defendants, the Prescribing Providers, and the Clinic Controllers, the Prescribing Providers – operating from No-Fault Clinics that treated thousands of Insureds – purported to prescribe the medically unnecessary and illusory Fraudulent Pharmaceuticals to the Insureds, while intentionally ignoring a vast array of prescription and over-the-counter medications readily available at a fraction of the cost.

45.     As a further part of the collusive relationships among the Defendants, the Prescribing Providers, and the Clinic Controllers, the Clinic Controllers then directed the prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs, so it could bill GEICO for huge sums as part of a scheme to exploit the Insureds for financial gain, without regard to genuine patient care.

46.     The No-Fault Clinics from where the prescriptions steered to Insta Drugs were generated included clinics that housed a "revolving door" of numerous other purported healthcare providers geared towards exploiting New York's No-Fault insurance system

47.     For example, GEICO has received billing from more than 65 different healthcare providers for healthcare goods and services rendered at a No-Fault Clinic located at 3027 Avenue

V, Brooklyn, New York, which was a major source of prescriptions that Insta Drugs submitted to GEICO in support of its charges.

48.    GEICO has also received billing from more than 60 different healthcare providers for healthcare goods and services rendered at a No-Fault Clinic located at 10825 Merrick Boulevard, Jamaica, New York, which was another major source of prescriptions that Insta Drugs submitted to GEICO in support of its charges.

49.    GEICO has also received billing from more than 235 different healthcare providers for healthcare goods and services rendered at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York, which was another major source of prescriptions that Insta Drugs submitted to GEICO in support of its charges.

50.    Further, one of the Prescribing Providers who steered numerous prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs from the No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York was associated with Metro Pain Specialists P.C., a professional corporation that has been named as a defendant in multiple affirmative fraud cases involving fraudulent services billed to No-Fault insurers, including State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al, 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586 -DG-RER (E.D.N.Y. 10/7/2021)

51.    Further, another one of the Prescribing Providers who steered numerous prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs from a No-Fault Clinic was Joseph Raia, M.D. ("Dr. Raia").  In 2014, Dr. Raia was charged by the Office of Inspector General with submitting false and fraudulent claims to Medicare for services that he never provided. As a result of those charges Dr. Raia was excluded from participating in all federal healthcare programs for fifteen years and was required to pay $1.5 million in penalties.

52.     The Defendants typically submitted to GEICO what were made to appear to be electronic prescriptions with the billing for the Fraudulent Pharmaceuticals from Insta Drugs.

53.     In fact, as of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – be prescribed electronically.

54.     In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription be on an official serialized New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.   See, N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).

55.     The purported "electronic prescriptions" submitted under the name of Insta Drugs were not legitimate electronic prescriptions in that they failed to contain, among other things, the electronic signature of the prescriber or the identifying features of legitimate electronic prescriptions that are electronically encrypted to prevent unauthorized access, alteration or use of the equipment used for electronic transmission of the prescriptions from the prescriber to the pharmacy.

56.     The Defendants used the purported "electronic prescriptions" submitted under the name of Insta Drugs to conceal the fact that they were directly steering the Prescribing Providers and the Clinic Controllers to provide Insta Drugs with voluminous, medically unnecessary prescriptions for the targeted set of Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals.

57.     The Defendants established Insta Drugs and chose to focus on the Fraudulent Topical Pain Products because similar over-the-counter drugs that could be dispensed to Insureds

were not covered expenses under the No-Fault Laws. However, the Defendants could acquire the Fraudulent Topical Pain Products at low cost and submit large volumes of claims for reimbursement at exorbitant prices by steering medically unnecessary prescriptions to Insta Drugs.

58.     Insta Drugs submitted its voluminous billing to GEICO for the Fraudulent Pharmaceuticals in approximately six months, and despite collecting hundreds of thousands of dollars from GEICO (and likely millions of dollars from all New York automobile insurers) over a period of six months, suddenly stopped submitting billing to GEICO in May 2020.

59.     Despite suddenly ceasing the submission of large volumes of billing to GEICO, Insta Drugs remains as an active corporation and Defendants continue their fraudulent scheme by hiring law firms to pursue collection of the unpaid fraudulent charges submitted to GEICO through numerous separate No-Fault arbitration or civil court collection proceedings.

60.     The Defendants' continued collection efforts through separate No-Fault arbitration or civil court collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a No-Fault arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescribing, steering, and dispensing of fraudulent pharmaceutical products to hundreds of patients across numerous different clinics located throughout the metropolitan area.

A.     **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care in Order to Exploit Patients for Financial Gain**

61.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers who prescribed pharmaceuticals dispensed by Insta Drugs were virtually always subjected to a

predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

62.     Evidence-based best practice guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

63.     More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom these medications are clinically appropriate.

64.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

65.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example, patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

66.     Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Insureds who received pharmaceuticals from Insta Drugs, and who were treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

67.     As part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products, primarily in the form of the exorbitantly priced Fraudulent Topical Pain Products.

68.     To the extent any examination was performed, the Prescribing Providers at times failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.  In the event a medical history was documented, such history was not

considered and had no influence on the Prescribing Provider's recommended treatment plan for the patient including whether to prescribe Fraudulent Pharmaceuticals dispensed by Insta Drugs.

69.     Prescribing the Fraudulent Pharmaceuticals without first taking a detailed patient history, or without considering such history, demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know, or consider, whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

70.     The Prescribing Providers also typically did not document in their examination reports whether the patients were intolerant of oral pain medications or whether oral pain medications were otherwise contraindicated thereby necessitating a prescription for a Fraudulent Topical Pain Product dispensed by Insta Drugs.

71.     The Prescribing Providers did not document in their examination reports any reason why the Fraudulent Topical Pain Products prescribed and dispensed by Insta Drugs were medically necessary.

72.     The Prescribing Providers also typically failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products prescribed to a particular patient were used by the patient.

73.     The Prescribing Providers also typically failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products provided any pain relief to the patient, improved symptoms, or were otherwise effective for the purpose prescribed.

74.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions of the Fraudulent Pharmaceuticals that were dispensed by Insta Drugs were based on

predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.

75.    In keeping with the fact that Defendants established Insta Drugs to exploit the Insureds' No-Fault Benefits, without regard to genuine needs of the Insureds, Insta Drugs made no effort to promptly deliver the Fraudulent Pharmaceuticals to Insureds and instead often purported to deliver them weeks or even months after the medications were prescribed, to the extent they were even delivered at all.

76.    For example,

(i)    Insured AG received a prescription for lidocaine 5% ointment on October 2, 2019 that was purportedly delivered by Insta Drugs on November 27, 2019, 56 days after the prescription was issued.

(ii)    Insured TW received a prescription for lidocaine 5% ointment on October 29, 2019 that was purportedly delivered by Insta Drugs on December 17, 2019, 49 days after the prescription was issued.

(iii)    Insured KFO received a prescription for lidocaine 5% ointment on October 29, 2019 that was purportedly delivered by Insta Drugs on December 10, 2019, 42 days after the prescriptions were issued.

(iv)    Insured RJ received prescriptions for lidocaine 5% ointment, cyclobenzaprine, and naproxen on November 18, 2019 that were purportedly delivered by Insta Drugs on January 28, 2020, 71 days after the prescriptions were issued.

(v)    Insured YD received prescriptions for diclofenac 3% gel and naproxen on December 5, 2019 that were purportedly delivered by Insta Drugs on January 29, 2020, 55 days after the prescriptions were issued.

(vi)    Insured TC received prescriptions for diclofenac 3% gel, cyclobenzaprine, and ibuprofen on December 12, 2019 that were purportedly delivered by Insta Drugs on January 20, 2020, 39 days after the prescriptions were issued.

(vii)    Insured QT received prescriptions for lidocaine 5% ointment and naproxen on January 7, 2020 that were purportedly delivered by Insta Drugs on February 26, 2020, 50 days after the prescriptions were issued.

(viii)   Insured RSG received prescriptions for lidocaine 5% ointment, cyclobenzaprine, and naproxen on April 9, 2020 that were purportedly delivered by Insta Drugs on May 18, 2020, 39 days after the prescriptions were issued.

(ix) Insured ST received prescriptions for lidocaine 5% ointment, cyclobenzaprine, and ibuprofen on April 9, 2020 that were purportedly delivered by Insta Drugs on May 18, 2020, 39 days after the prescriptions were issued.

(x)  Insured NT received a prescription for diclofenac 3% gel on December 16, 2019 that was purportedly delivered by Insta Drugs on January 21, 2020, 36 days after the prescription was issued.

77.     In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

78.     An individual's age, height, weight, general physical condition, location within the vehicle, and the severity of the impact will all affect the spectrum and extent of injuries to an individual in a given automobile accident, as each person in the vehicle experiences an individual mechanism of injury.

79.     It is extremely improbable that multiple Insureds involved in the same automobile accident who were treated by the same Prescribing Provider would routinely require the same pharmaceutical products.

80.     Even so, and in keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their examinations with a Prescribing Provider.

81.     For example,

(i)  On September 23, 2019, two Insureds – TH and ZSJ – were allegedly involved in the same automobile accident. Thereafter, TH and ZSJ both received treatment with Metro Pain Specialists, PC at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York with Michael Alleyne, M.D. ("Alleyne") on November 25, 2019.  TH and ZSJ were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Insta Drugs, after their initial examinations TH and ZSJ were both issued prescriptions from Alleyne for lidocaine 5% ointment, naproxen, and cyclobenzaprine, which were dispensed and billed by Insta Drugs.

(ii)  On October 26, 2019, two Insureds – EP and EM – were allegedly involved in the same automobile accident. Thereafter, EP and EM both received prescriptions from John Greco, M.D. ("Greco") at 2488 Grand Concourse, Bronx, New York on December 11, 2019, despite GEICO receiving no bills or other records that indicate that EP and EM ever saw Greco for an examination.  EP and EM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Insta Drugs, EP and EM were both issued prescriptions from Greco for lidocaine 5% ointment, naproxen, and cyclobenzaprine, which were dispensed and billed by Insta Drugs.

(iii)  On December 6, 2019, three Insureds – MJ, IH, and KW – were allegedly involved in the same automobile accident. Thereafter, MJ, IH, and KW all received treatment with Joseph A. Raia M.D.  P.C. at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York with Joseph Raia, M.D. ("Raia") on December 10, 2019.  MJ, IH, and KW were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Insta Drugs, after their initial examinations MJ, IH, and KW were all issued prescriptions from Raia three days later on December 18, 2019 for lidocaine 5% ointment, naproxen, and cyclobenzaprine, which were dispensed and billed by Insta Drugs.

(iv) On December 10, 2019, three Insureds – HS, TC, and LS – were allegedly involved in the same automobile accident. Thereafter, HS, TC, and LS all received treatment with Brooklyn Doc Medical PC at a No-Fault Clinic located at 1849 Utica Avenue, Brooklyn, New York with Ananthakumar Thillainathan, M.D. ("Thillainathan). HS, TC, and LS were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Insta Drugs, after their initial examinations HS, TC, and LS were all issued prescriptions from Thillainathan for diclofenac 3% gel, ibuprofen, and cyclobenzaprine, which were dispensed and billed by Insta Drugs.

(v)   On December 28, 2019, two Insureds – EM and DM – were allegedly involved in the same automobile accident. Thereafter, EM and DM both received treatment with Joseph A. Raia M.D.  P.C. at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York with Raia on December 31, 2019.  EM and DM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Insta Drugs, after their initial examinations EM and DM were both issued prescriptions from Raia for lidocaine 5% ointment, naproxen, and cyclobenzaprine, which were dispensed and billed by Insta Drugs.

82.     The Defendants' sole concern was to steer as many prescriptions as possible for the Fraudulent Pharmaceuticals to Insta Drugs in order to maximize profits, without any regard for genuine patient care.

**B.     The Fraudulent Lidocaine Prescriptions**

83.     The Prescribing Providers prescribed, and Insta Drugs purported to dispense, medically unnecessary topical lidocaine 5% ointment, billing GEICO as much as $2,286 for a single tube of lidocaine ointment.

84.     The Defendants, in exchange for the payment of kickbacks or other incentives, received medically unnecessary prescriptions for lidocaine 5% ointment from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

85.     The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for lidocaine 5% ointment because the Defendants could readily buy these products at low cost but submit claims for reimbursement through Insta Drugs to GEICO and other New York No-Fault insurers for huge sums based on egregiously high wholesale list prices.

86.     In keeping with the fact that these Fraudulent Topical Pain Products were prescribed and dispensed pursuant to predetermined protocols designed to maximize profits without regard to patient care, lidocaine 5% ointment was prescribed, dispensed, and billed for

despite the fact that it was medically unnecessary and that there are other, less expensive, lidocaine products which are approved by the United States Food and Drug Administration ("FDA") and available over-the-counter.

87.     In further keeping with the fact that these Fraudulent Topical Pain Products were prescribed pursuant to predetermined treatment and billing protocols designed to maximize profits without regard to patient care, over 65% of all GEICO Insureds who had a prescription filled by Insta Drugs received a lidocaine 5% ointment.

88.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Topical lidocaine is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

89.     Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

90.     Topical pain patches in which the primary ingredient is lidocaine are FDA approved only to treat chronic post-herpetic neuropathic pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – may be more attributable to its placebo effect rather than the pharmacological action of the patches themselves.  In fact, while application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

91.     Excessive dosage or short intervals between doses of topical lidocaine can cause adverse effects.  Patients should be instructed to strictly adhere to the recommended dosage and a single application of topical lidocaine should not exceed 5 grams.

92.     Insta Drugs nevertheless repeatedly billed GEICO for dispensing lidocaine 5% ointment containing 5% lidocaine to numerous GEICO's Insureds.

93.     Notably, lidocaine ointments and patches with 4% lidocaine are available over-the-counter and have a similar efficacy of lidocaine 5% at a fraction of the cost.

94.     Over-the-counter products such as Icy Hot Lidocaine or Aspercreme with lidocaine, both of which contain 4% lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10 or less.

95.     Yet, the Prescribing Providers never recommended Insureds first try commonly available commercial lidocaine products to treat their patients' minor aches and pains which they sustained in fender-bender type motor vehicle accidents, instead repeatedly prescribing topical lidocaine 5% ointment that was billed to GEICO for as much as $2,286 for a single tube.

96.     The lidocaine 5% ointment dispensed by Insta Drugs was prescribed pursuant to predetermined protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

97.     In keeping with the fact that lidocaine 5% ointment was being prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, the Prescribing Providers and Insta Drugs often prescribed and dispensed (i) more than 5 grams of lidocaine 5%  ointment per patient, which is beyond the recommended dosage for any single application and (ii) additional and duplicative pharmaceuticals to the patients, including both oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers contemporaneous to the lidocaine 5% ointment.

98.     The initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the contemporaneous prescription of multiple pharmaceuticals.

99.     The lidocaine 5% ointment was also routinely prescribed at the time of the initial examination during the acute states of the Insureds' pain symptoms before Insureds even had an opportunity to first try readily available, low-cost, over the counter lidocaine products or oral pain medication.

100.    For example:

(i)     On November 19, 2019, an Insured named KW was allegedly involved in an automobile accident.  On January 22, 2020, the Insured sought treatment with Health East Medical Alliance at a No-Fault Clinic located at 108-25 Merrick Boulevard, Jamaica, New York and underwent an initial examination with David Suarez, M.D. ("Suarez").  Suarez purportedly prescribed KW lidocaine 5% ointment and naproxen.  Suarez did not state the medical basis for the excessive prescriptions, advise the Insured to try over-the-counter lidocaine products, or note in his examination report that he would be prescribing lidocaine 5% ointment.  Insta Drugs purported to deliver the prescriptions to KW six days later, on January 31, 2020.

(ii)    On November 21, 2019, an Insured named DT was allegedly involved in an automobile accident.  On November 26, 2019, the Insured sought treatment with Ace Emergent Medical Care PC at a No-Fault Clinic located at 108-25 Merrick Boulevard, Jamaica, New York and underwent an initial examination with Christian Bannerman, M.D. ("Bannerman").  Bannerman purportedly prescribed DT lidocaine 5% ointment and Celecoxib.  Bannerman did not state the medical basis for the excessive prescriptions, advise the Insured to try over-the-counter lidocaine products, or note in his examination report that he would be prescribing lidocaine 5% ointment.  Insta Drugs purported to deliver the prescriptions to DT nine days later, on December 5, 2019.

(iii)   On November 24, 2019, an Insured named MH was allegedly involved in an automobile accident.  On December 18, 2019, the Insured sought treatment with Joseph A. Raia M.D.  P.C. at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York and underwent an initial examination with Raia.  Raia purportedly prescribed MH lidocaine 5% ointment, cyclobenzaprine, and naproxen.  Raia did not state the medical basis for the excessive prescriptions, or advise the Insured to try over-the-counter lidocaine products.  Additionally, the "Management Plan" in Raia's examination report indicated that the Insured should take "Tylenol/Motrin pm" with no mention of lidocaine 5%

ointment being prescribed.  Insta Drugs purported to deliver the prescriptions to MH 19 days later, on January 6, 2020.

(iv)   On January 5, 2020, an Insured named ZW was allegedly involved in an automobile accident.  On January 21, 2020, the Insured sought treatment with Joseph A. Raia M.D.  P.C. at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York and underwent an initial examination with Eric Kenworthy, M.D. ("Kenworthy").  Kenworthy purportedly prescribed ZW lidocaine 5% ointment, cyclobenzaprine, and naproxen.  Kenworthy did not state the medical basis for the excessive prescriptions, or advise the Insured to try over-the-counter lidocaine products.  Insta Drugs purported to deliver the prescriptions to ZW seven days later, on January 28, 2020.

(v)   On January 30, 2020, an Insured named GR was allegedly involved in an automobile accident.  On February 3, 2020, the Insured sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an initial examination with Greco.   Greco purportedly prescribed GR lidocaine 5% ointment, cyclobenzaprine and naproxen.  Greco did not state the medical basis for the excessive prescriptions or advise the Insured to try over-the-counter lidocaine products.  Insta Drugs purported to deliver the prescriptions to GR nine days later, on February 12, 2020.

101.   In further keeping with the fact that the lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, any follow-up examination reports prepared by certain Prescribing Providers virtually never addressed whether the lidocaine was effective or not, to what degree, or whether the patient experienced any side effects.

102.   For example:

(i)   Insured KW saw Suarez for a follow up examination on February 19, 2020.  Suarez did not address that KW had previously been prescribed lidocaine medication, whether the lidocaine was effective or not, or whether KW experienced any side effects.

(ii)   Insured DT saw Bannerman for a follow up examination on December 26, 2019.  Bannerman did not address that DT had previously been prescribed lidocaine medication, whether the lidocaine was effective or not, or whether DT experienced any side effects.  Nevertheless, despite checking that DT should "continue current med," Bannerman purported to prescribe DT

diclofenac 3% gel and Celecoxib.  Insta Drugs purported to deliver the prescriptions to DT five days later, on December 31, 2019.

(iii)    Insured MH went to Joseph A. Raia M.D. P.C. again on January 21, 2020 and saw Kenworthy for a follow up examination.  Kenworthy did not address that MH had previously been prescribed lidocaine medication, whether the lidocaine was effective or not, or whether MH experienced any side effects. Nevertheless, Kenworthy purported to prescribe MH lidocaine 5% ointment, cyclobenzaprine, and naproxen again.  Insta Drugs purported to deliver the prescriptions to MH 14 days later, on February 4, 2020.

(iv)    Insured ZW saw Kenworthy for a follow up examination on March 5, 2020. Kenworthy did not address that ZW had previously been prescribed lidocaine medication, whether the lidocaine was effective or not, or whether ZW experienced any side effects.  Nevertheless, Insta Drugs purported to deliver a refill of lidocaine 5% ointment, cyclobenzaprine, and naproxen to ZW on that same date, March 5, 2020.

(v)    Insured GR saw Greco for a follow up examination on March 2, 2020.  Greco did not address that GR had previously been prescribed lidocaine medication, whether the lidocaine was effective or not, or whether GR experienced any side effects.  Nevertheless, Greco indicated in his exam report that he would again prescribe lidocaine 5% ointment.

103.    There is no legitimate medical reason for the Prescribing Providers to prescribe large volumes of lidocaine 5% ointment to Insureds, particularly given the availability of over-the-counter medications, as well as the lack of indication for use for the Insureds.

104.    There is no legitimate medical reason why Insta Drugs repeatedly dispensed lidocaine 5% ointment to Insureds, particularly given the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

105.    The Defendants' egregious billing in predetermined patterns, coupled with the fact that the Prescribing Providers routinely failed to properly document the Insureds' use of these

medications, further indicates that there is no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications, and for Insta Drugs to have dispensed these medications, to the Insureds, particularly given the potential for adverse health effects.

**C.**    **The Fraudulent Diclofenac Prescriptions**

106.    In accordance with the fraudulent scheme discussed above, Insta Drugs routinely billed GEICO for the exorbitantly priced topical NSAID diclofenac sodium in the form diclofenac 3% gel, pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers.

107.    Insta Drugs billed GEICO up to $3,396.00 for a single tube of diclofenac 3% gel dispensed to a single Insured.

108.    In further keeping with the fact that the Fraudulent Topical Pain Products were prescribed pursuant to predetermined treatment and billing protocols designed to maximize profits without regard to patient care, over 30% of all GEICO Insureds who had a prescription filled by Insta Drugs received diclofenac 3% gel.

109.    The Defendants, in exchange for the payment of kickbacks or other incentives, received medically unnecessary prescriptions for diclofenac 3% gel from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols

110.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for diclofenac 3% gel because the Defendants could readily buy diclofenac 3% gel at low cost but submit claims for reimbursement through Insta Drugs to GEICO and other New York No-Fault insurers for huge sums based on egregiously high wholesale list prices.

111.    In keeping with the fact that these Fraudulent Topical Pain Products were prescribed and dispensed pursuant to predetermined protocols designed to maximize profits without regard to patient care, the diclofenac 3% gel products were prescribed, dispensed, and billed for despite the fact that they were medically unnecessary and that there are other, less expensive, over-the-counter, FDA-approved topical pain products available.

112.    While formulations containing 1% diclofenac are typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet, they have not been proven effective for treating strains or sprains.

113.    Moreover, the diclofenac 3% gel that the Prescribing Providers prescribed, and the Defendants dispensed and billed for, is only indicated for the treatment of actinic (or solar) keratosis – a pre-cancerous skin condition caused by years of excessive sun exposure.  There have been no studies supporting safety of diclofenac 3% gel when applied to larger body areas.

114.    Diclofenac 3% gel has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of diclofenac 3% gel to treat musculoskeletal injuries an accepted off-label use.

115.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

116.    A "Black Box Warning" is the strictest FDA warning attached to the labeling of a prescription drug or product and is designed to call attention to serious or life-threatening risks associated with the drug or product.

117.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii)

diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

118.    Notwithstanding the most common and accepted uses for diclofenac 3% gel, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of diclofenac 3% gel, while they oftentimes simultaneously prescribed NSAIDs such as naproxen or celecoxib.

119.    Prescribing diclofenac 3% gel while simultaneously prescribing or recommending the patient take oral NSAIDs is therapeutic duplication, which may result in increased risk of adverse events with no additional therapeutic benefit.

120.    Nevertheless, certain Prescribing Providers consciously prescribed and the Defendants consciously dispensed diclofenac 3% gel in conjunction with other oral NSAIDs to numerous Insureds regardless of the nature of each Insured's injuries and the risks it posed to the Insureds' health and well-being.

121.    For example:

(i)    On November 12, 2019, an Insured named AM was allegedly involved in an automobile accident.  On January 21, 2020, AM saw Pauline Raitses, D.O. ("Raitses") for a follow up examination at Midwood Metropolitan Medical, P.C., located at a No-Fault clinic at 3040 Nostrand Avenue, Brooklyn, New York.  Raitses purportedly prescribed AM diclofenac 3% gel, as well as naproxen, with no mention of the potential health risks of taking the medications together.  Insta Drugs purportedly delivered the prescriptions to AM six days later, on January 27, 2020.

(ii)    On December 11, 2019, an Insured named LS was allegedly involved in an automobile accident.  On December 12, 2019, LS saw Thillainathan for an initial examination at Brooklyn Doc Medical PC, located at a No-Fault clinic at 1849 Utica Avenue, Brooklyn, New York.  Thillainathan purportedly prescribed LS diclofenac 3% gel, as well as cyclobenzaprine and ibuprofen, with no mention of the potential health risks of taking the medications together.  Insta Drugs purportedly delivered the prescriptions to LS 39 days later, on January 20, 2020

    (iii)    On December 18, 2019, an Insured named FO was allegedly involved in an automobile accident. On December 20, 2019, FO saw Muhammad Zakaria, M.D. ("Zakaria") for an initial examination at QR Medical Services, PC, located at a No-Fault clinic at 148-21 Jamaica Avenue, Jamaica, New York. Zakaria purportedly prescribed FO diclofenac 3% gel, as well as celecoxib, with no mention of the potential health risks of taking the medications together. Insta Drugs purportedly delivered the prescriptions to FO two days later, on December 22, 2020.

    (iv)    On January 16, 2020, an Insured named EF was allegedly involved in an automobile accident. On that same day, January 16, 2020, EF saw Raitses for an initial examination at Midwood Metropolitan Medical, P.C., located at a No-Fault clinic at 3040 Nostrand Avenue, Brooklyn, New York. Raitses purportedly prescribed EF diclofenac 3% gel, as well as naproxen, with no mention of the potential health risks of taking the medications together. Insta Drugs purportedly delivered the prescriptions to EF 11 days later, on January 27, 2020.

    (v)    On January 16, 2020, an Insured named MP was allegedly involved in an automobile accident. On that same day, January 16, 2020, MP saw Raitses for an initial examination at Midwood Metropolitan Medical, P.C., located at a No-Fault clinic at 3040 Nostrand Avenue, Brooklyn, New York. Raitses purportedly prescribed MP diclofenac 3% gel, as well as naproxen, with no mention of the potential health risks of taking the medications together. Insta Drugs purportedly delivered the prescriptions to MP 11 days later, on January 27, 2020.

122.    The diclofenac 3% gel was prescribed pursuant to predetermined treatment protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

123.    In keeping with the fact that the diclofenac 3% gel was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

124.    For example:

(i)     On November 12, 2019, an Insured named JP was allegedly involved in a motor vehicle accident.  On January 14, 2020, JP saw Raitses for a follow up examination at Midwood Metropolitan Medical, P.C.,  located at a No-Fault clinic at 3040 Nostrand Avenue, Brooklyn, New York.  Raitses purportedly prescribed JP diclofenac 3% gel and naproxen, but did not state the medical basis for the prescriptions in her exam report, and did not advise the Insured to try over-the-counter pain products.  Insta Drugs purportedly delivered the diclofenac 3% gel and naproxen  to JP six days later, on January 20, 2020.

(ii)    On November 15, 2019, an Insured named ED was allegedly involved in a motor vehicle accident.  On December 5, 2019, ED saw Rafael Dela Cruz, M.D. ("Dela Cruz") for an initial examination at Time to Care Medical, P.C. located at a No-Fault clinic at 222-01 Hempstead Avenue, Queens Village, New York.  Dela Cruz purportedly prescribed ED diclofenac 3% gel using a prescription stamp, but indicated on his examination report that a compound pain cream was being prescribed, did not state the medical basis for the diclofenac 3% gel prescription in his exam report, and did not advise the Insured to try over-the-counter pain products.  Insta Drugs purportedly delivered the diclofenac 3% gel to ED five days later, on December 10, 2019.

(iii)   On December 11, 2019, an Insured named YC was allegedly involved in a motor vehicle accident.  On December 16, 2019, YC saw Radha Gara, M.D. ("Gara") for an initial examination at Gara Medical Care, P.C., located at a No-Fault clinic at 9208 Jamaica Avenue, Woodhaven, New York.  Gara purportedly  prescribed YC diclofenac 3% gel, but did not state the medical basis for the prescription in his exam report, and did not advise the ed to try over-the-counter pain products.  Insta Drugs purportedly delivered the diclofenac 3% gel to YC 15 days later, on December 31, 2019.

(iv)    On December 25, 2019, an Insured named CH was allegedly involved in a motor vehicle accident.  On January 8, 2020, CH saw Dela Cruz for an initial examination at Time to Care Medical, P.C. located at a No-Fault clinic at 222-01 Hempstead Avenue, Queens Village, New York.  Dela Cruz purportedly prescribed CH diclofenac 3% gel using a prescription stamp, but indicated on his examination report that a compound pain cream was being prescribed, did not state the medical basis for the diclofenac 3% gel prescription in his exam report, and did not advise the Insured to try over-the-counter pain products.  Insta Drugs purportedly delivered the diclofenac 3% gel to CH two days later, on January 10, 2020.

(v)     On December 25, 2019, an Insured named NW was allegedly involved in a motor vehicle accident.  On January 9, 2020, NW saw Bannerman for an initial examination at Ace Emergent Medical Care PC,  located at a No-Fault clinic at 108-25 Merrick Boulevard, Jamaica, New York.  Bannerman purportedly prescribed NW diclofenac 3% gel and celecoxib, but did not state the medical basis for the prescriptions in his exam report, and did not advise

the Insured to try over-the-counter pain products.  Insta Drugs purportedly delivered the diclofenac 3% gel and celecoxib to NW five days later, on January 14, 2020.

125.    Insta Drugs billed GEICO hundreds of thousands of dollars for diclofenac 3% gel despite its lack of proven efficacy or safety in the treatment of musculoskeletal injuries, and caused the Prescribing Providers and Clinic Controllers to steer prescriptions to them solely to maximize its profits.

**D.    The Illegal, Collusive Arrangements Between Insta Drugs and the Prescribing Providers and Clinic Controllers**

126.    To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Insta Drugs for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, and in exchange for kickbacks, which egregiously inflated the charges submitted to GEICO.

127.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

128.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, many of which treat thousands of Insureds, to have the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then direct those prescriptions to Insta Drugs so that the Defendants could bill GEICO egregious sums.

129.    In furtherance of the scheme, the Prescribing Providers and Clinic Controllers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of

the No-Fault Clinics and to route those prescriptions to Insta Drugs pursuant to collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

130.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals despite their knowledge that: (i) the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; (iii) the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

131.    Here, the Defendants arranged with various No-Fault Clinics that treat thousands of Insureds to have the licensed physicians and/or their associates operating therefrom, including the Prescribing Providers, prescribe, or purport to prescribe, the medically unnecessary and illusory Fraudulent Pharmaceuticals to the Insureds, which in turn permitted the Defendants to bill GEICO huge sums under the name of Insta Drugs.

132.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, despite their knowledge that the Fraudulent Pharmaceuticals were medically unnecessary and were being prescribed without regard to pharmacologic outcomes or cost and attention to fiscal responsibility.

133.    The Prescribing Providers and Clinic Controllers issued and directed the many prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs because the prescriptions were only being issued pursuant to the illegal, collusive arrangements among the Defendants and the Prescribing Providers and Clinic Controllers.

134.    The Prescribing Providers and Clinic Controllers never gave the Insureds the option to use a pharmacy of their choosing, rather the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located far from Insta Drugs and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

135.    Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

136.    In fact, only approximately 20% of Insureds who received prescriptions from Insta Drugs reside anywhere in Bronx County – the county where Insta Drugs is located.  Over 60% of Insureds who received prescriptions from Insta Drugs resided in Brooklyn or Queens.

137.    Upon information and belief, Insta Drugs purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever having the choice of which pharmacy to use and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

138.    For example, one Insured advised GEICO that he did not receive any medications through delivery to his residence, despite Insta Drugs billing GEICO for diclofenac 3% gel on

February 29, 2020, while another Insured reported receiving lidocaine 5% ointment, cyclobenzaprine, and naproxen at his home two months after his treatment had ceased, despite neither requesting or expecting the pharmaceuticals. Insta Drugs submitted a bill for these prescriptions on February 6, 2020.

139. The Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Insta Drugs, and to ensure that the Defendants benefitted financially from the prescriptions.

140. In keeping with the fact that the Insureds were not given an option to identify a pharmacy of their own choosing, the Prescribing Providers would routinely issue identical prescriptions for the Fraudulent Pharmaceuticals to be filled at pharmacies other than Insta Drugs, as opposed to a refill, in an effort to conceal their fraud.

141. For example:

(i) On October 28, 2019, Insured DJ was prescribed lidocaine 5% ointment, Flector 1.3% patches, and ibuprofen by Suarez, which were filled by 21st Century Pharmacy Inc. on November 4, 2019. All three prescriptions included refills which were later filled by 21st Century Pharmacy Inc. on December 6, 2019 and January 6, 2020. However, on November 26, 2019, DJ was prescribed lidocaine 5% ointment and ibuprofen by Suarez using a separate set of prescriptions which were filled by Insta Drugs on December 3, 2019. On December 30, 2019, DJ was again prescribed lidocaine 5% ointment and ibuprofen by Suarez, which were filled by Insta Drugs on January 3, 2020. On February 17, 2020, DJ was prescribed lidocaine 5% ointment and naproxen by Suarez, which were filled by Grace Pharmacy on February 24, 2020. On March 21, 2020, Elite Drugs & Surgical filled prescriptions for diclofenac 3% gel and ibuprofen. DJ was also prescribed diclofenac 3% gel and lidocaine 4% patches by Rehman, which were filled by Boulevard 9229 LLC on June 9, 2020. On June 12, 2020, Expert Pharmacy filled prescriptions for diclofenac 3% gel, meloxicam, and oxycodone. All told, DJ purportedly received the Fraudulent Pharmaceuticals from six different pharmacies, and aside from the prescriptions that were filled at 21st Century Pharmacy Inc., was never issued a prescription with a refill, despite being prescribed the same Fraudulent Pharmaceuticals multiple times.

(ii) On November 26, 2019, Insured SS was prescribed lidocaine 5% ointment, cyclobenzaprine, and ibuprofen by Suarez, which were filled by Insta Drugs on

December 2, 2019.  On January 13, 2020, SS was again prescribed lidocaine 5% ointment and ibuprofen by Suarez, which were filled by Insta Drugs on January 27, 2020.  On February 17, 2020, SS was again prescribed lidocaine 5% ointment and ibuprofen by Suarez, which were filled by Grace Pharmacy on February 24, 2020. On March 18, 2020, SS was prescribed lidocaine 5% ointment and ibuprofen by Arkam Rehman, M.D. ("Rehman"), which were filled by Elite Drugs & Surgical on March 21, 2020.  Rehman worked at the same No-Fault clinic as Suarez. On March 18, 2020, SS was prescribed diclofenac 3% gel by Rehman, which was filled by Elite Drugs & Surgical on April 11, 2020.  On June 8, 2020, SS was again prescribed lidocaine 5% ointment and ibuprofen by Rehman, which were filled by Briarwood RX, Inc on June 30, 2020.  On August 5, 2020, SS was prescribed lidocaine 5% ointment and cyclobenzaprine by Cristy Perdue, M.D. ("Perdue"), which were filled by AVK RX Pharmacy on August 10, 2020.  All told, SS purportedly received the Fraudulent Pharmaceuticals from five different pharmacies, and was never issued a prescription with a refill, despite being prescribed the same Fraudulent Pharmaceuticals multiple times.

(iii)  On November 26, 2019, Insured DR was prescribed lidocaine 5% ointment and ibuprofen by Suarez, which were filled by Insta Drugs on December 3, 2019.  On February 4, 2020, DR was prescribed lidocaine 5% ointment, lidocaine 5% patches, ibuprofen, and omeprazole by Suarez, which were filled by Grace Pharmacy on March 2, 2020.  The prescriptions for ibuprofen and omeprazole included two refills, but prescriptions for lidocaine 5% ointment and lidocaine 5% patches did not. On March 11, 2020, DR was prescribed lidocaine 5% ointment and diclofenac 3% gel by Rehman, which were filled by Elite Drugs & Surgical on March 14, 2020 and April 3, 2020, respectively.  On May 27, 2020, DR was prescribed diclofenac 3% gel and lidocaine 4% patches by Rehman, which were filled by Boulevard 9229 LLC on May 27, 2020.  On May 29, 2020, DR was prescribed lidocaine 5% ointment, cyclobenzaprine, and naproxen by Perdue, which were filled by Atlas Pharmacy LLC on June 30, 2020.  On June 8, 2020, DR was again prescribed lidocaine 5% ointment and ibuprofen by Rehman, where were filled by Briarwood RX, Inc. on July 2, 2020.  All told, DR purportedly received the Fraudulent Pharmaceuticals from six different pharmacies, and was never issued a prescription for a Fraudulent Topical Pain Product with a refill, despite being prescribed the same Fraudulent Topical Pain Products multiple times.

(iv)  On November 26, 2019, Insured AJ was prescribed lidocaine 5% ointment, cyclobenzaprine, and ibuprofen by Suarez, which were filled by Insta Drugs on December 2, 2019.  On January 7, 2020, AJ was prescribed diclofenac 3% gel and ibuprofen by Suarez, which were filled by Insta Drugs on January 9, 2020.  On February 10, 2020, AJ was again prescribed lidocaine 5% ointment and ibuprofen by Suarez, which were filled by Grace Pharmacy on February 17, 2020.  On March 4, 2020, AJ was prescribed lidocaine 5% ointment and ibuprofen by Rehman, which were filled by Elite Drugs & Surgical on March 17, 2020.  On May 20, 2020, AJ was prescribed diclofenac 3% gel and lidocaine 4% patches by Rehman, which were filled by Boulevard 9229 LLC on May 26, 2020.  On June 8, 2020, AJ was

again prescribed lidocaine 5% ointment and ibuprofen by Rehman, which was filled by Boulevard 9229 LLC on June 22, 2020.  One day later, on June 9, 2020, AJ was prescribed a diclofenac 2% solution by Rehman, which was filled by Briarwood Rx.  On June 15, 2020, AJ was again prescribed diclofenac 3% gel and lidocaine 4% patches by Rehman, which were filled by DI Pharmacy Corp on June 30, 2020.  All told, AJ purportedly received the Fraudulent Pharmaceuticals from five different pharmacies, and was never issued a prescription with a refill, despite being prescribed the same Fraudulent Pharmaceuticals multiple times.

(v)   On January 9, 2020, Insured NW was prescribed diclofenac 3% gel and celecoxib by Bannerman, which were filled at Insta Drugs on January 14, 2020.  On February 24, 2020, NW was again prescribed diclofenac 3% gel and celecoxib by Bannerman, which were filled by Grace Pharmacy on March 3, 2020.  NW was not issued a prescription with a refill, despite being prescribed the same Fraudulent Pharmaceuticals more than once.

142.   The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

143.   The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

144.   The Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives such as employment at a No-Fault Clinic.

145.   But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Insta Drugs.

146.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

147.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentive, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Insta Drugs.

148.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**E.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

149.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

150.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

151.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

152. For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

153. The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Pharmaceuticals because the Defendants could readily buy the Fraudulent Pharmaceuticals at low cost, but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

154. The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive wholesale prices in order to inflate the billing submitted through Insta Drugs so as to maximize their profits.

155. In support of their charges, the Defendants typically submitted an NF-3 or HCFA-1500 form which included the purported NDC numbers and corresponding charges for each drug product dispensed.

156. The NDC numbers listed on the NF-3 Form submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

157. The Defendants never submitted their actual wholesale purchase invoices demonstrating (i) how much the Defendants actually paid the supplier for the Fraudulent Pharmaceuticals, and (ii) whether the Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

158. In fact, the Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to

dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Topical Pain Products.

159.    Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved, proven effective medications or commercially available over-the-counter-products.

## IV.    The Defendants' Submission of Fraudulent NF-3 and HCFA-1500 Forms to GEICO

160.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Insta Drugs seeking payment for the pharmaceuticals for which it is ineligible to received payment.

161.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

     i.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were not medically necessary and were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

    ii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants are in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous prescriptions to Insta Drugs for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives; and

    iii.    The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants are in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. §

65-3.16(a)(12).   In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

iv.     The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants are in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, the Defendants did not comply with all material licensing requirements in that the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Insta Drugs pursuant to illegal, invalid, and duplicitous prescriptions.

## V.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

162.     The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

163.     To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

164.     Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the Defendants (i) have been involved in collusive, kickback arrangements to generate voluminous prescriptions pursuant to a fraudulent predetermined treatment and billing protocol, without regard to genuine patient care; (ii) prescribed and dispensed pharmaceuticals that have no efficacious value and grossly exceed the cost of other effective FDA-approved medication; and (iii) submitted illegal, invalid, and duplicitous prescriptions, which they represented as valid.

165.     The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

166.     The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Insta Drugs continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Insta Drugs has been engaged in fraud.

167.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $496,800.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

168.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

169.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

170.     There is an actual case in controversy between GEICO and the Defendants regarding approximately $529,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that Insta Drugs has submitted to GEICO.

171.     Insta Drugs has no right to receive payment for any pending bills submitted to GEICO because it billed for Fraudulent Pharmaceuticals that were medically unnecessary and

were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

172.    Insta Drugs has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Insta Drugs in exchange for unlawful kickbacks and other financial incentives.

173.    Insta Drugs has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and caused Insta Drugs to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO.

174.    Insta Drugs has no right to receive payment for any pending bills submitted to GEICO because the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Insta Drugs pursuant to illegal, invalid, and duplicitous prescriptions.

175.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Insta Drugs has no right to receive payment for any pending bills submitted to GEICO.

**THE SECOND CLAIM FOR RELIEF**
**Against All Defendants**
**(Common Law Fraud)**

176.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

43

177.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals.

178.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Pharmacy Fee Schedule, when in fact the Fraudulent Pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care; (ii) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous prescriptions to Insta Drugs for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives; (iii) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and (iv) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the because the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Insta Drugs pursuant to illegal, invalid, and duplicitous prescriptions.

179.     The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Insta Drugs that were not compensable under the No-Fault Laws.

180.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $203,400.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Insta Drugs.

181.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

182.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against All Defendants**
**(Unjust Enrichment)**

183.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

184.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

185.     When GEICO paid the bills and charges submitted by or on behalf of Insta Drugs for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

186.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

187.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

188.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $203,400.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim For Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Insta Drugs has no right to receive payment for any pending bills, amounting to approximately $529,000.00 submitted to GEICO;

B.    On the Second Claim For Relief against Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $203,400.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Third Claim For Relief against Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $203,400.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated:  Uniondale, New York
       May 3, 2022

                            RIVKIN RADLER LLP

                            By:  _____*/s/ Michael A. Sirignano*_____
                                  Michael A. Sirignano (MS 5263)
                                  Barry I. Levy (BL 2190)
                                  Steven T. Henesy (SH 6357)
                          926 RXR Plaza
                          Uniondale, New York 11556
                          (516) 357-3000

                          *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*